UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION



FILED

JAN 1 3 2011

CLERK. US DISTRICT COURT
NORFOLK, VA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

EASTMAN CHEMICAL RESINS, INC.

        Defendant.

Civ. No. 2:11cv41

# COMPLAINT

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

## STATEMENT OF CASE

1.     This is a civil action brought pursuant to Section 311(b)(7) of the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(7), and Section 3008 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928. The United States seeks civil penalties against Defendant for inadequacies in its preparations to respond to an oil spill, unlawfully discharging oil into waters of the United States, and failing to test and evaluate hazardous waste.

## JURISDICTION AND VENUE

2.     Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action because it arises out of Sections 301 and 311(j) of the CWA, 33 U.S.C. §§ 1311 and 1321(j); and Section 3008(a) of RCRA, 42 U.S.C. § 6928(a).

3.     This Court also has jurisdiction over this action, in which Plaintiff, the United States, seeks the imposition of civil penalties against Defendant, pursuant to 28 U.S.C. §§ 1345 and 1355.

4.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), provides that a civil action may be brought "in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and require compliance."

5.     Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E), provides that a civil penalty action for violations of Section 311 of the CWA may be brought "in the district court of the United States for the district in which the defendant is located, resides, or is doing business, and such court shall have jurisdiction to assess such penalty."

6.     Section 3008 of RCRA, 42 U.S.C. § 6928, provides that the United States may commence an action to impose a penalty for a violation of any requirement of subchapter III of RCRA, 42 U.S.C. §§ 6921-39f, in the district court for the district in which the violation occurred.

7.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1395(a), because Defendant operates manufacturing units at the Franklin Plant in Courtland, Virginia and does business within the District; and because the violations occurred within the District.

8.     The authority to bring this action is vested in the United States Department of Justice under 33 U.S.C. § 1366 and 28 U.S.C. §§ 516 and 519.

## NOTICE

9.     In accordance with Section 3008(a)(2) of RCRA, 42 U.S.C. § 6928(a)(2), the Commonwealth of Virginia has been notified of the commencement of this action.

2

## DEFENDANT

10.    Defendant Eastman Chemical Resins, Inc. ("Eastman") is a Delaware corporation with a principal place of business located at 100 North Eastman Road, Kingsport, Tennessee.

11.    Defendant is a "person" within the meaning of Section 502 of the Clean Water Act, 33 U.S.C. § 1362(5), and Section 1004 of RCRA, 42 U.S.C. § 6903(15).

## STATUTORY BACKGROUND

### The Resource Conservation and Recovery Act

12.    Congress enacted the Resource Conservation and Recovery Act in 1976 to amend the Solid Waste Disposal Act of 1965. Pub. L. No. 94-580 §§ 1-2. Later, the Hazardous and Solid Waste Amendments of 1984 amended both prior acts. *See generally* Pub. L. No. 98-616. The three acts are collectively known as "RCRA" and exist in the U.S. Code at 42 U.S.C. §§ 6901-92k.

13.    Subtitle C of RCRA authorizes regulation of hazardous wastes.

14.    Pursuant to Section 3006 of RCRA, 42 U.S.C. § 6926, the EPA may authorize states to implement a hazardous waste program in lieu of the federal program.

15.    Virginia has received federal authorization to administer a Hazardous Waste Management Program (the "Virginia Hazardous Waste Management Program") in lieu of the federal hazardous waste management program established under RCRA Subtitle C, 42 U.S.C. §§ 6921-6939e.

16.    The Virginia Hazardous Waste Management Regulations ("VaHWMR"), as codified at VaHWMR §§ 1.0 et seq. (1984), were authorized, effective December 18, 1984 (49 Fed. Reg. 47391 (December 4, 1984)), by the EPA pursuant to Section 3006(b) of RCRA, 42 U.S.C. § 6926(b), and 40 C.F.R. Part 271, Subpart A, and subsequently were re-authorized effective: August 13, 1993 (58 Fed. Reg. 32885 (June 14, 1993)); September 29, 2000 (65 *Fed.*

3

*Reg.* 46607 (July 31, 2000)), as amended, and codified in 9 VAC 20-60-12 *et seq.* (1999); and June 20, 2003 (68 *Fed. Reg.* 36925 (June 20, 2003)).

17.     With certain exceptions, the VaHWMR incorporate definitions and adopt specific provisions of Title 40 of the Code of Federal Regulations (July 2001 edition) by reference. *See* 9 VAC 20-60-14, -18, and -260 through -279. This Complaint addresses violations by Defendant of RCRA and of the federally authorized Virginia Hazardous Waste Management Program. For convenience, all citations are to the federal hazardous waste management regulations set forth at 40 C.F.R. Parts 260 – 279 unless otherwise noted.

18.     The provisions of the Virginia hazardous waste management program, by virtue of EPA authorization, have become requirements of Subtitle C of RCRA and are enforceable by the EPA pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), in lieu of the analogous provisions of the federal regulations.

## Regulation of Oil under the Clean Water Act

19.     Section 311(b)(1) of the CWA established the policy prohibiting any discharges of oil into or upon the navigable waters of the United States or their adjoining shorelines. 33 U.S.C. § 1321(b)(1).

20.     Section 311(a)(1) of the CWA defines "oil" as: "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil." 33 U.S.C. § 1321(a)(1).

21.     Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), prohibits the discharge of oil into or upon the navigable waters of the United States or adjoining shorelines in such quantities that have been determined may be harmful to the public health or welfare or the environment of the United States.

4

22.    For purposes of Section 311(b)(3) of the CWA, a discharge of oil into or upon the navigable waters of the United States in a quantity which may be harmful to the public health or welfare or the environment of the United States is a discharge of oil that causes a film or a sheen upon, or discoloration of, the surface of the water or adjoining shorelines, or causes a sludge or emulsion to be deposited beneath the surface of the water or upon the adjoining shorelines.

### Spill Prevention, Control and Countermeasure Regulations

23.    In Section 311(j)(1)(C) of the CWA, Congress required the President to promulgate regulations which would, among other things, establish procedures, methods, and equipment requirements to prevent discharges of oil and hazardous substances from onshore facilities into navigable waters and for containing such discharges. 33 U.S.C. § 1321(j)(1)(C).

24.    Section 501(a) of the CWA grants the President the general authority to promulgate regulations necessary to carry out these functions under the CWA. 33 U.S.C. § 1361(a).

25.    The President delegated the responsibility to promulgate the regulations for non-transportation-related onshore facilities to the Administrator of the EPA in Section 1, Paragraph 4 of Executive Order 11735 (August 3, 1973), and in Section 2(b)(1) of Executive Order 12777 (October 18, 1991).

26.    In 1973, the Administrator promulgated the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112.

27.    Under the Oil Pollution Prevention Regulations, "oil" is defined as:

[O]il of any kind or in any form, including, but not limited to: fats, oils, or greases of animal, fish or marine mammal origin; vegetable oils, including oils from seeds, nuts, fruits or kernels; and, other oils and greases, including petroleum, fuel oil, sludge, synthetic oils, mineral oils, oil refuse, or oil mixed with wastes other than dredge spoil.

5

40 C.F.R. § 112.2.

28.     The Oil Pollution Prevention Regulations apply to owners or operators of non-transportation-related onshore and offshore facilities engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing or consuming oil or oil products, which store at least 1,320 gallons of oil above-ground or 42,000 gallons below-ground, and which, due to their location, could reasonably be expected to discharge oil in harmful quantities, as defined in 40 C.F.R. Part 110, into or upon navigable waters of the United States or adjoining shorelines (collectively, "Part 112 Facilities"). 40 C.F.R. §§ 112.1(b) and (d).

29.     Section 112.3 requires that the owners and operators of certain Facilities prepare Spill Prevention, Control and Countermeasure ("SPCC") Plans in writing, in accordance with 40 C.F.R. § 112.7, which contains detailed guidelines for preparing and implementing SPCC Plans. 40 C.F.R. § 112.3.

30.     Section 112.5 requires facility owners and/or operators to amend their SPCC Plans whenever a change in facility design, construction, operation, or maintenance materially affects a facility's ability to discharge oil into or upon navigable waters or adjoining shorelines. 40 C.F.R. § 112.5(a).

### Facility Response Plan ("FRP") Regulations

31.     In 1990, Congress amended Section 311 of the CWA by enacting the Oil Pollution Act of 1990 ("OPA"). Included in this amendment was Section 311(j)(5)(A), which required the President to promulgate regulations which would mitigate potential harm caused by vessels, and onshore and offshore oil facilities that, because of their location, could reasonably be expected to cause substantial harm to the environment by discharging oil into or on the navigable waters of the United States or adjoining shorelines ("substantial harm facilities"). 33 U.S.C. § 1321(j)(5)(A).

32.    Congress directed the President to promulgate regulations requiring the owners or operators of substantial harm facilities to submit to the President a plan for responding to worst case oil discharges and the substantial threat of such discharges to be known as a Facility Response Plan ("FRP").

33.    In Section 2(d)(1) of Executive Order 12777 (October 18, 1991), the President delegated to the Administrator of the EPA the authority to promulgate such regulations under Section 311(j) of the CWA for non-transportation-related onshore facilities.

34.    Pursuant to Section 311(c)(1)(C) and 311(j)(5)(A) of the CWA, 33 U.S.C. §§ 1321(c)(1)(C) and 1321(j)(5)(A), and the President's delegation of authority, in 1994 the Administrator of the EPA amended 40 C.F.R. Part 112 by promulgating additional oil spill response regulations, known as the FRP regulations, applicable to certain facilities, including those with a storage capacity of 1 million gallons of oil or greater, or 42,000 gallons of aboveground oil storage engaged in over-water transfers. 40 C.F.R. § 112.20.

35.    Pursuant to the FRP regulations, the owner or operator of a substantial harm facility is required to prepare and submit an FRP to the EPA. 40 C.F.R. § 112.20.

36.    In 2002, the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112 were amended. The implementation deadline for the 2002 amendments for existing facilities subsequently was extended to October 31, 2007. 40 C.F.R. § 112.3(a). The implementation deadline was again extended to July 1, 2009, 72 Fed. Reg. 27443 (May 16, 2007), then to November 10, 2010, 74 Fed. Reg. 29136 (June 13, 2009), and then to November 11, 2011, 75 Fed. Reg. 63093 (October 14, 2010).

37.    Oil storage facilities in operation prior to August 16, 2002, such as the Franklin Plant, specifically were required to maintain their existing SPCC plans and remain in compliance

7

with all preexisting regulatory requirements prior to the implementation deadline for the amended regulations pursuant to 40 C.F.R. § 112.3(a).

## GENERAL ALLEGATIONS

### The Franklin Plant

38.     The Franklin Plant (the "Facility") is located at 21123 Shady Brook Trail near the intersection of State Highways 650 and 671 about three miles west of the town of Franklin, Virginia.

39.     The Franklin Plant is situated on approximately 120 acres of land owned by Hercules Incorporated ("Hercules").

40.     Other companies, including Eastman, own certain production equipment located at the Franklin Plant.

41.     The Franklin Plant is bordered by State Route 671 to the north, the Nottoway River to the west, the main rail line to the south, and both the Wills Gut, a tributary of the Nottoway River, and a rail spur to the east.

42.     A rail spur runs from the main rail line along the east side of the Franklin Plant and is used by the Franklin Plant as a rail car unloading area and rail car storage area. In addition to the eastern rail spur, another rail spur extends from the main trunk line into the center of the Franklin Plant.

43.     The Franklin Plant is less than one-quarter mile from the banks of the Nottoway River.

44.     The Nottoway River is a navigable water of the United States and a perennial tributary of the Chowan River.

## The EPA's Investigation of the Franklin Plant

45.    The EPA conducted a comprehensive, multimedia inspection of the Franklin Plant between April 5, 2005 and April 15, 2005. EPA personnel inspected the physical plant of the Franklin Plant, including each of the manufacturing units. The EPA interviewed employees of Eastman and other companies at the Facility about industrial practices and processes at the Franklin Plant. The EPA reviewed various documents relating to the operations at the Franklin Plant, including the "Shared Facility Agreement" (SFA) and the "Integrated Contingency Plan" (ICP).

46.    The EPA followed up its initial inspection of the Franklin Plant by sending information request letters to Defendant and other companies on February 2, 2006 with respect to various operations associated with the Franklin Plant.

47.    On April 18, 2006, the EPA visited, for the purpose of inspecting rail cars, a facility in Deepwater, New Jersey (the "New Jersey TSD Facility") that received for final disposal the railcar deliveries of hazardous waste generated at the Franklin Plant. The EPA obtained samples of the contents of the rail cars at the New Jersey TSD Facility.

48.    The EPA returned to the Franklin Plant between April 19, 2006 and April 27, 2006 to take additional samples from a rail car used for the shipment of hazardous waste for off-site disposal. The rail car had been recently returned by the New Jersey TSD Facility and was being stored as though it were empty.

## Industrial Operations at the Franklin Plant

49.    At the time of the EPA's inspection of the Franklin Plant, there were four primary industrial units operating at the Facility: (1) the Crude Tall Oil Fractionation Unit; (2) the Aquapel Process Unit; (3) the Pamolyn Process Unit; and (4) the Vul-Cup Process Unit.

50.    Hercules originally used the Facility for the fractionation of crude tall oil.

51.     Crude tall oil is a byproduct of wood pulp, generated by pulp and paper mills.

52.     The Crude Tall Oil Fractionation Unit consisted of a crude tall oil tank farm in the northwest corner of the Facility and a processing area on the west side of the Facility.

53.     The Crude Tall Oil Fractionation Unit separated crude tall oil into different refined outputs.

54.     The Crude Tall Oil Fractionation Unit generated a wastewater, which was treated in an on-site Wastewater Treatment Facility ("WWTF") located in the southwestern corner of the Facility.

55.     In 2001, Eastman acquired ownership of certain equipment associated with the Crude Tall Oil Fractionation Unit from Hercules, but Hercules continued to own the land on which the Crude Tall Oil Fractionation Unit was located.

56.     Eastman also purchased from Hercules in 2001 certain equipment associated with the Franklin Plant's WWTF, the power generation unit, and the Pamolyn Process Unit, but Hercules continued to own the land on which all of this equipment was located.

57.     On or about 2008, Eastman shut down the Crude Tall Oil Fractionation Unit.

58.     Wastewater generated in process units at the Franklin Plant is discharged to the Nottoway River through an outfall subject to a NPDES permit.

### The Canal

59.     Process wastewater at the Franklin Plant is discharged through a pipe, known as Outfall 002, into a canal ("Canal") located on the western side of the Facility.

60.     Hercules owns the Canal and the land on which it is located.

### The Shared Facility Agreement

61.     Hercules and Eastman manufactured their respective products at the Facility pursuant to one or more Shared Facility Agreements.

10

62.   Under the Shared Facility Agreement(s), Hercules supplied tenants of the Franklin Plant, including Eastman, with certain services, including environmental services, at the Franklin Plant.

63.   Hercules employees perform work in connection with all operations at the Facility.

### Hazardous Waste Generation at the Franklin Plant

64.   Title 40, Part 262 of the Code of Federal Regulations provides regulations applicable to generators of hazardous waste.

65.   "Generator" for the purposes of those regulations means "any person, by site, whose act or process produces hazardous waste identified or listed in part 261 of this chapter or whose act first causes a hazardous waste to become subject to regulation." 40 C.F.R. § 260.10.

66.   Eastman was a "generator" of 1,000 kg or more of hazardous waste per calendar month ("large quantity generator") with respect to the Franklin Plant.

67.   Section 3005(a) of RCRA, 42 U.S.C. § 6925(a), authorized the EPA to promulgate regulations requiring that each owner or operator of a facility that treats, stores or disposes of hazardous waste obtain a permit or qualify for interim status for the facility.

68.   At no time relevant to this complaint did Hercules have a RCRA permit or interim status for the treatment, storage or disposal of hazardous waste at the Franklin Plant.

### COUNT I –DEFICIENT SPILL RESPONSE PLANS

69.   Paragraphs 1 through 68 are incorporated by reference as if fully set forth herein.

70.   Section 112.20 of the Oil Pollution Prevention Regulations requires the owner or operator of a non-transportation related onshore oil storage facility having an aggregate above-ground storage capacity of equal to or greater than 1 million gallons, which, due to its location,

could be reasonably expected to do substantial harm to the environment by discharging oil into navigable waters or onto adjoining shorelines, to prepare an FRP. 40 C.F.R. § 112.20(f)(1)(ii).

71.    From at least 2005 until at least 2008, (i) the Franklin Plant, and (ii) the Crude Tall Oil Fractionation Unit, were each "non-transportation related onshore oil storage facilities" with a storage capacity of greater than 1 million gallons.

72.    From at least 2005 until at least 2008, due to their location, (i) the Franklin Plant, and (ii) the Crude Tall Oil Fractionation Unit, could be reasonably expected to do substantial harm to the environment by discharging oil into navigable waters or onto adjoining shorelines.

73.    From at least 2005 until at least 2008, Eastman was an "owner" or "operator" of the Crude Tall Oil Fractionation Unit.

74.    At all times relevant to this complaint, Eastman engaged in producing, gathering, storing, processing, refining, transferring, distributing, or consuming oil.

75.    Pursuant to 40 C.F.R. § 112.3 (2002), Eastman was required to prepare a SPCC Plan.

76.    Pursuant to 40 C.F.R. § 112.20, Eastman was required to prepare an FRP.

77.    A SPCC Plan must be a "carefully thought-out plan, in accordance with good engineering practices." 40 C.F.R. 112.7 (2002). A "description of the physical layout of a facility" is a general requirement for an SPCC Plan.

78.    Section 112.20(h) of the Oil Pollution Prevention Regulations requires that an FRP follow the format of the Model FRP attached as Appendix F to Part 112 or shall be an equivalent plan that contains the elements contained in that section. 40 C.F.R. § 112.20(h) (2002), as amended (2003).

79.    The Model FRP provides that an FRP facility must identify each tank containing oil or a hazardous substance at the facility and provide such information as the maximum capacity of the tank, its construction and its year of installation. 40 C.F.R. Part 112, Appendix F, "Hazard Identification," Section 1.4.1(1)-(3).

80.    The Model FRP states that the facility diagrams should include and identify the contents and capacities of all bulk oil storage tanks and drum oil storage areas. 40 C.F.R. Part 112, Appendix F, "Diagrams," Section 1.9.

81.    Section 112.20(h)(9) of the Oil Pollution Prevention Regulations requires the FRP to include diagrams of the facility. 40 C.F.R. § 112.20(h)(9).

82.    In lieu of preparing separate FRP and SPCC plans, Eastman utilized a single integrated contingency plan ("ICP") for the Franklin Plant.

83.    The ICP included an inventory of oil storage tanks and containers at Tables A1-1 through A1-5.

84.    The ICP failed to identify the following oil storage tanks and containers in use by Eastman at the Franklin Plant: two 300-gallon fatty acid reclamation vats in the Pamolyn Process Unit.

85.    The ICP also failed to identify the following oil storage tanks and containers at the Franklin Plant: four above-ground storage tanks (T-306, T318, T-320, T-302) used for the storage of heptane and heptane mixtures; several transformers containing mineral oil located throughout the Franklin Plant; and several 55-gallon drums of oils located around the Facility.

86.    Because the ICP did not include a complete listing of all of the oil storage tanks and drums at the Franklin Plant, it failed to comply with 40 C.F.R. §112.20(h).

13

87.    Because the ICP did not identify all of the oil storage containers in use at the Franklin Plant, the ICP did not constitute a proper SPCC Plan consistent with "good engineering practices" and failed to comply with 40 C.F.R. § 112.7.

88.    Eastman's failure to comply with 40 C.F.R. §§ 112.7 and 112.20(h) constitutes separate violations of regulations issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j).

89.    Section 311(b)(7)(C) provides that "[a]ny person who fails or refuses to comply with any regulation issued under subsection (j) of this section shall be subject to a civil penalty in an amount up to $25,000 per day of violation." 33 U.S.C. § 1321(b)(7)(C). The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

## COUNT II – FAILURE TO IMPLEMENT FRP

90.    Paragraphs 1 through 89 are incorporated by reference as if fully set forth herein.

91.    Pursuant to Section 112.21(a) of the Oil Pollution Prevention Regulations, 40 C.F.R. § 112.21(a), Eastman was required to conduct emergency response training drills on at least an annual basis.

92.    Pursuant to Section 112.21(b) and (c), 40 C.F.R. § 112.21(b) & (c), Eastman, was required to implement a training program and a program of drills and exercises that followed the U.S. Coast Guard's Training Elements for Oil Spill Response and the National Preparedness for Response Exercise Program ("PREP"), unless the EPA specifically approved an alternative program for a facility.

93.    The EPA did not approve an alternative program for the Franklin Plant.

94.    Upon information and belief, from at least 2005 until at least 2006, Eastman did not complete all of the training, drills, and/or exercises.

95.    Eastman's failure to perform the required training, drills, and/or exercises violates 40 C.F.R. § 112.21, a regulation issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j).

96.    Section 311(b)(7)(C) provides that "[a]ny person who fails or refuses to comply with any regulation issued under subsection (j) of this section shall be subject to a civil penalty in an amount up to $25,000 per day of violation." 33 U.S.C. § 1321(b)(7)(C). The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

## COUNT III –UNLAWFUL DISCHARGES OF OIL

97.    Paragraphs 1 through 96 are incorporated by reference as if fully set forth herein.

98.    Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), prohibits the discharge of oil into or upon the navigable waters of the United States or adjoining shorelines in such quantities that have been determined may be harmful to the public health or welfare or the environment of the United States.

99.    The Franklin Plant and the Canal are onshore facilities within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10).

100.    At all times relevant to this complaint, Eastman was an owner and operator of the Franklin Plant and an operator of the Canal.

101.    Oil, as defined by Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1), and 40 C.F.R. § 112.2, has been discharged, within the meaning of Section 311(a)(2) of the CWA, 33 U.S.C. § 1321(a)(2), in harmful quantities, as defined by 40 C.F.R. § 110.3, from the Franklin Plant and from the Canal into navigable waters of the United States.

### August 17-22, 2005 Oil Spill

102. Between August 17 and August 22, 2005, at least 100 pounds of a mixture of crude tall oil and fatty acids were discharged from the Franklin Plant's Wastewater Treatment Facility through the Canal.

103. Crude tall oil and fatty acids are "oils" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1) and 40 C.F.R. § 110.3.

104. Oil from this release was found as far as one-half mile downstream in the Nottoway River.

105. The amount of oil discharged in the Nottoway River between August 17 and 22, 2005, was a "harmful quantity" as defined by 40 C.F.R. § 110.3.

### July 17, 2006 Oil Spill

106. On July 17, 2006, approximately 4 gallons of tall oil were released from the Franklin Plant into the Nottoway River.

107. Tall oil is an "oil" within the meaning of Section 311(a)(1) of the CWA, 33 U.S.C. § 1321(a)(1) and 40 C.F.R. § 110.3.

108. The amount of oil discharged on July 17, 2006 was a "harmful quantity" as defined by 40 C.F.R. § 110.3.

### August 31, 2007 Oil Spill

109. At approximately midnight on August 31, 2007, an unknown quantity of fatty acid was released from the Franklin Plant into the Nottoway River.

110. The fatty acid created a whitish sheen on the surface of the Nottoway River.

111. The quantity of oil discharged on August 31, 2007 was a harmful quantity of oil as defined by 40 C.F.R. § 110.3.

### November 6, 2007 Oil Spill

112.    On November 6, 2007, approximately 10 gallons of tall oil and fatty acid were released from the Franklin Plant into the Nottoway River.

113.    The amount of oil discharged on November 6, 2007 was a "harmful quantity" as defined by 40 C.F.R. § 110.3.

### Liability for the Above Spills

114.    Eastman as an owner and/or operator of a facility that discharged oil in a harmful quantity into a navigable water of the United States, is liable for a violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

115.    Section 311(b)(7)(A) of the CWA provides that "[a]ny person who is the owner, operator, or person in charge of any vessel, onshore facility or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged." 33 U.S.C. § 1321(b)(7)(A). The Civil Monetary Penalty Inflation Adjustment Rule increased this penalty to $32,500 per day or $1,100 per barrel for spills occurring after March 15, 2004. 40 C.F.R. § 19.4.

### COUNT IV – INADEQUATE SECONDARY CONTAINMENT

116.    Paragraphs 1 through 115 are incorporated by reference as if fully set forth herein.

117.    Section 112.7(c) of the Oil Pollution Prevention Regulations addresses appropriate containment and/or diversionary structures and equipment to be used by an oil storage facility to contain oil spills and prevent the migration of oil into navigable waters and adjacent shorelines. 40 C.F.R. § 112.7(c).

118.    Any containment system must be capable of containing oil until the spill is cleaned up. 40 C.F.R. § 112.7(c).

### Automatic Sump

119.    At the time of the 2005 inspection, there were two tank farms in the Crude Tall Oil Fractionation Unit with a total oil storage capacity of approximately 3,330,786 gallons.

120.    The northern tank farm was surrounded by a containment barrier and was linked to the southern tank farm by an automatic pump and a drain pipe.

121.    Eastman's southern tank farm was surrounded by a secondary containment dike, which had a 379,500 gallon capacity.

122.    Eastman was an owner and an operator of the Crude Tall Oil Fractionation Unit, including the northern and southern tank farms.

123.    During the April 2005 inspection, EPA personnel observed a sump equipped with an automatic pump inside the area surrounded by the southern tank farm's containment dike. The sump pumped liquids to the 2,300 gallon wet well in the WWTF, which discharged effluent to the Outfall 002 Canal.

124.    Section 112.7(c)(1)(i) requires that a containment dike be "sufficiently impervious to contain oil." 40 C.F.R. § 112.7(c)(1)(i).

125.    A containment dike with an automatic sump providing a pathway beyond the walls of the dike is not "sufficiently impervious to contain oil."

126.    On information and belief, under the physical configuration of the Facility as of the 2005 inspection, oil released from certain-sized spills in the Crude Tall Oil Fractionation Unit tank farms would migrate via the automatic sump through the WWTF, to the Canal and into the Nottoway River.

127.    Due to the presence of a sump with an automatic pump in the southern tank farm, the linked northern and southern tank farms did not constitute containment dike systems which are "sufficiently impervious to contain spilled oil" in accordance with 40 C.F.R. § 112.7(c)(1)(i).

18

### Pamolyn Process Unit Unloading Rack

128.   At the time of the April 2005 inspection, an unloading rack adjacent to Tanks T-37 and T-38 in the Pamolyn Process Unit was used for the transfer of a fatty acid, which is an oil. This unloading rack lacked any secondary containment.

129.   Eastman was an owner and an operator of the unloading rack.

130.   Eastman's failure to provide any secondary containment for this unloading rack violated 40 C.F.R. § 112.7(e)(4)(ii) (2002), as amended by 40 C.F.R. § 112.7(h)(1) (2003).

### Outfall 002 Canal

131.   Eastman relied, at times relevant to this complaint, on the Canal as a containment structure for oil spills.

132.   At times relevant to this complaint, the ICP asserted that the Canal potentially provides as much as 215,000 gallons of secondary or tertiary containment for oils released at the Facility.

133.   From at least 2005 until at least 2008, Eastman relied upon the alleged containment volume provided by the Canal as providing secondary containment for a number of structures and pieces of equipment at the Franklin Plant.

134.   Eastman claimed in its ICP that oils reaching the Outfall 002 Canal will be prevented from entering the Nottoway River by the dam and underwater baffle system installed in the Canal.

135.   Section 112.7(c) of the Oil Pollution Prevention Regulations, 40 C.F.R. § 112.7(c), requires that an owner or operator of an oil storage facility must provide an appropriate containment system to prevent the release of oil in harmful quantities to the waters of the United States. In the context of containment dikes and other physical barriers, this means that such structures must be sufficiently impervious so as to contain spilled oil.

136.    The Outfall 002 Canal is not impervious to the flow of fluids and does not constitute "impervious" containment.

137.    The Outfall 002 Canal does not comply with the requirements of 40 C.F.R. § 112.7(c) because it does not capture oils which flow into the Outfall 002 Canal in order to prevent the release of oils in harmful quantities to the Nottoway River.

138.    Since October 2002, the Franklin Plant has experienced several spills of oil during which harmful quantities of oil were discharged through the Outfall 002 Canal into the Nottoway River.

139.    The repeated releases of oil from Outfall 002 over successive years demonstrates that the dam and baffle system installed in the Canal is ineffective in preventing the movement of oil from the Canal into the Nottoway River.

140.    Because the Outfall 002 Canal is not an adequate secondary containment system, and the process units described above had no other secondary containment system, the Franklin Plant was not in compliance with 40 C.F.R. § 112.7(c).

### Liability for lack of secondary containment

141.    Eastman's failures to comply with 40 C.F.R. § 112.7 constitute violations of a regulation issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j).

142.    Section 311(b)(7)(C) provides that "[a]ny person who fails or refuses to comply with any regulation issued under subsection (j) of this section shall be subject to a civil penalty in an amount up to $25,000 per day of violation." 33 U.S.C. § 1321(b)(7)(C). The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

20

## COUNT V – INSUFFICIENT FACILITY LIGHTING

143.    Paragraphs 1 through 142 are incorporated by reference as if fully set forth herein.

144.    The Oil Pollution Prevention Regulations require facilities to have lighting sufficient to allow the detection and control of oil spills at night.  40 C.F.R. § 112.7(g)(5)(i) (2005).

145.    The Franklin Plant operates twenty-four hours per day, seven days a week.

146.    The nighttime operations at the Franklin Plant include the storage, use, and movement of oil through the facility and each of its process areas.

147.    During the April 2005 inspection, EPA personnel noted that the area surrounding Valve No. 2, which controls the flow from the southern drainage ditch into the Outfall 002 Canal, was completely unlit at night.

148.    EPA personnel also noted the absence of lighting in the vicinity of Valve No. 4 at Outfall 003 at night.

149.    The lack of lighting in the areas of Valves No. 2 and No. 4 would impede the night time detection of spilled oil in the southern and eastern drainage ditches, as well as the operation of Valves Nos. 2 and 4, which might be needed to capture oil originating from a significant portion of the Franklin Plant.

150.    Eastman's failure to install proper lighting in the vicinities of Valves No. 2 and No. 4 in accordance with 40 C.F.R. § 112.7(g)(5)(i) (2005), constitutes a violation of a regulation issued under Section 311(j) of the CWA, 33 U.S.C. § 1321(j).

151.    Section 311(b)(7)(C) provides that "[a]ny person who fails or refuses to comply with any regulation issued under subsection (j) of this section shall be subject to a civil penalty in an amount up to $25,000 per day of violation." 33 U.S.C. § 1321(b)(7)(C).  The Civil

Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

## COUNT VI – FAILURE TO MAKE A HAZARDOUS WASTE DETERMINATION

152.    Paragraphs 1 through 151 are incorporated by reference as if fully set forth herein.

153.    At all times relevant to this Complaint, Eastman owned and operated the WWTF.

154.    The WWTF's Wet Well receives waste liquids and drainage from various production areas of the Franklin Plant, including the Car Wash Pit.

155.    The Wet Well discharges its contents to an oil-water separator known as S-100.

156.    Eastman periodically skimmed oils from S-100 and transferred them to a tank known as T-604.

157.    Eastman also periodically skimmed oils from the equalization tank, known as T-601, and the stormwater tank, known as T-605, and transferred the skimmed oils to T-604.

158.    The skimmed oils collected in T-604 were periodically transferred to tank T-7 or tank T-8.

159.    In addition to the skimmed oils transferred from T-604, T-7 received oil collected from certain other parts of the Franklin Plant.

160.    Oils collected in T-7 and T-8 were periodically transferred to tank P-3.

161.    Eastman periodically added Pamak, another oil, to tank P-3.

162.    The oils in tank P-3 were removed from P-3 and burned in one of three vaporizers at the Franklin Plant.

163.    The following are "solid wastes" as defined in 40 C.F.R. § 261.2:

    a.    the skimmed oils being collected from S-100;

    b.    the skimmed oils being collected from T-601;

    c.    the skimmed oils being collected from T-605;

    d.    the oils in T-7;

    e.    the oils in T-8; and

    f.    the oils in P-3.

164.    Eastman is a "generator" of the solid wastes identified in Paragraph 163.

165.    Pursuant to 40 C.F.R. § 262.11, "[a] person who generates a solid waste, as defined in 40 C.F.R. 261.2, must determine if that waste is a hazardous waste" using certain specified methods.

166.    The EPA took two samples of the skimmed oils from S-100 in April 2006 and analyzed those samples in accordance with the Toxicity Characteristic Leaching Procedure ("TCLP") set forth in 40 C.F.R. § 261.24.

167.    The two samples had concentrations of 6.69 ppm and 7.8 ppm of chromium.

168.    A solid waste that contains chromium at concentrations greater than 5.0 ppm as determined by TCLP testing exhibits the characteristic of toxicity for chromium and is a hazardous waste.

169.    The skimmed oils being collected from S-100 were hazardous waste characterized with EPA hazardous waste number D007.

170.    Eastman violated 40 C.F.R. § 262.11 by failing to perform an adequate hazardous waste determination for the solid wastes identified in paragraph 163.

171.    Eastman's failures to comply with 40 C.F.R. § 262.11 constitute violations of a regulation issued under Section 3002(a) of RCRA, 42 U.S.C. § 6922(a), which is enforceable by the EPA pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a).

172.    Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), states that "[a]ny person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation." The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

## COUNT VII – FAILURE TO CREATE AND/OR RETAIN SKIMMED OIL WASTE ANALYSIS

173.    Paragraphs 1 through 172 are incorporated by reference as if fully set forth herein.

174.    The skimmed oils collected from S-100 were hazardous waste because they exhibited the toxicity characteristic for chromium.

175.    The point at which oils were skimmed at tank S-100 constituted a point of generation for purposes of 40 C.F.R. Part 268.

176.    The hazardous waste oils skimmed from S-100 then moved through the Franklin Plant's WWTF, including to Tanks T-7, T-8, and P-3.

177.    In addition to the skimmed oils transferred from T-604, T-7 received oil collected from certain other parts of the Franklin Plant, constituting a point of generation for purposes of 40 C.F.R. Part 268.

178.    Oils in T-8 were treated, constituting a point of generation for purposes of 40 C.F.R. Part 268.

179.    Oils collected in T-7 and T-8 were periodically transferred to tank P-3.

180.    Eastman periodically added a commercial fuel oil to tank P-3, thereby constituting a point of generation for purposes of 40 C.F.R. Part 268.

181.    The oils in tank P-3 were removed from P-3 and burned in the vaporizers at the Franklin Plant.

182.    All or a portion of the waste from each of the locations identified in Paragraph 184 was subsequently burned in the Facility's vaporizers, thereby generating an ash which was then land disposed.

183.    Pursuant to 40 C.F.R. § 268.7(a)(1), a generator of hazardous waste must determine if the waste has to be treated before it can be land disposed.  This is done by determining whether the waste meets the treatment standards of 40 C.F.R. §§ 268.40, 268.45 or 268.49 and is known as a land disposal restriction ("LDR") waste determination. According to that section, this may be done by either testing the waste or using knowledge of the process by which the waste is generated, and, must identify any underlying hazardous constituents.

184.    Eastman had no such LDR waste determination for each of the following waste streams in its on-site files:

      a.    the skimmed oils being collected from S-100;

      b.    the oils in T-7;

      c.    the oils in T-8; and

      d.    the oils in Tank P-3.

185.    Eastman's failure to perform an LDR waste determination for each of the waste streams identified in Paragraph 184 constitutes separate violations of 40 C.F.R. § 268.7(a)(1).

186.    Eastman's failures to comply with 40 C.F.R. § 268.7(a)(1) constitutes violations of a regulation issued under Section 3002(a) of RCRA, 42 U.S.C. § 6922(a), which is enforceable by the EPA pursuant to Section 3008(a) of RCRA, 42 U.S.C. § 6928(a).

187.    Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), states that "[a]ny person who violates any requirement of this subchapter shall be liable to the United States for a civil penalty in an amount not to exceed $25,000 for each such violation. Each day of such violation shall, for purposes of this subsection, constitute a separate violation." The Civil Monetary Penalty Inflation Adjustment Rule has increased this penalty to $32,500 per day for violations occurring after March 15, 2004. 40 C.F.R. §19.4.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, the United States of America, respectfully requests that the Court:

1.    Order Defendant to pay civil penalties up to the statutory maximum in the CWA, RCRA, and EPCRA;

2.    Award the United States the costs of this action; and

3.    Award other relief as this Court deems just and proper.

Respectfully Submitted,

FOR THE UNITED STATES

IGNACIA S. MORENO
Assistant Attorney General
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

26

1/13/11
_____
Dated

DANIEL S. SMITH
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
202-305-0371 (voice)
202-616-6583 (fax)
dan.smith2@usdoj.gov

NEIL H. MACBRIDE
United States Attorney

1/13/11
_____
Dated

By: _____

CRAIG P. WITTMAN
Assistant United States Attorney
Virginia Bar No. 39409
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail Address - Craig.Wittman@usdoj.gov